146 T.C. No. 8

UNITED STATES TAX COURT

ESTATE OF VICTORIA E. DIERINGER, DECEASED, EUGENE DIERINGER, EXECUTOR, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21992-13.                    Filed March 30, 2016.

Decedent (D) and some family members owned DPI, a closely held real property management corporation.  D was a majority shareholder in DPI, owning 425 out of 525 voting shares and 7,736.5 out of 9,920.5 nonvoting shares.

During her life D established Trust (T) and Foundation (F). Her son G was sole trustee of T and F.  D's will left her entire estate to T.  Pursuant to the terms of the trust agreement, $600,000 went to various charitable organizations and D's children received minor amounts of her personal effects.  The remainder of her estate, consisting primarily of DPI stock, would be distributed to the acting trustee of F to be administered in accordance with the terms of the trust agreement.

An appraisal for purposes of determining the date-of-death fair market value (FMV) of D's property valued D's DPI nonvoting and voting shares at $14,182,471.  The appraisal valued the voting stock

at $1,824 per share with no applicable discount. The nonvoting stock was valued at $1,733 per share, including a 5% discount to reflect the lack of voting power at shareholder meetings.

Numerous events occurred after D's death but before D's bequeathed property was transferred to F. Seven months after D's death DPI elected S corporation status. DPI also agreed to redeem all of D's bequeathed shares from T. DPI and T amended and modified the redemption agreement, with DPI agreeing to redeem all 425 of the voting shares but only 5,600.5 of the nonvoting shares. In exchange for the redemption, T received a short-term promissory note for $2,250,000 and a long-term promissory note for $2,968,462 (as amended). At the same time as the redemption, pursuant to subscription agreements, three of D's sons, including G, purchased additional shares in DPI. F later reported that it had received three noncash contributions consisting of the short-term and long-term promissory notes (as amended) plus nonvoting DPI shares.

An appraisal of D's DPI stock for purposes of the redemption and subscription agreements determined that D's DPI voting shares had a FMV of $916 per share and the nonvoting shares, of $870 per share. The appraisal of the voting stock included discounts of 15% for lack of control and 35% for lack of marketability. The appraisal of the nonvoting stock included the lack of control and marketability discounts plus an additional 5% discount for the lack of voting power at stockholder meetings.

The parties dispute the amount of the charitable contribution. The estate (E) argues that the charitable contribution should not depend upon or be measured by the value received by F. Respondent (R) argues that the amount of the charitable contribution should be determined by postdeath events.

Because R found that the value of E's charitable contribution was lower than reported on its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, R determined that additional estate tax is due. R also determined that E is liable for an

accuracy-related penalty under I.R.C. sec. 6662(a) for an underpayment attributable to negligence or disregard of rules or regulations within the meaning of I.R.C. sec. 6662(b)(1).

Held:  E's charitable contribution is less than the date-of-death fair market value of the bequeathed property because numerous events occurred after D's death that changed the nature and reduced the value of the property that was actually transferred to F.

Held, further, R properly allocated the proportionate share of additional estate tax due to each of the specific bequests and reduced the charitable contribution deduction attributable to those bequests respectively.

Held, further, E is liable for an accuracy-related penalty under I.R.C. sec. 6662(a) for an underpayment attributable to negligence.

Marc Kellogg Sellers, for petitioner.

Randall G. Durfee, Janis B. Geier, and Jeffrey D. Rice, for respondent.

KERRIGAN, Judge:  Respondent determined a deficiency of $4,124,717 in the Federal estate tax of the Estate of Victoria E. Dieringer (estate) and an accuracy-related penalty under section 6662(a) of $824,943.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references

are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

The issues for consideration are:  whether the estate is entitled to a charitable contribution deduction equal to the date-of-death fair market value of stock bequeathed to the Bob and Evelyn Dieringer Family Foundation (foundation); and whether the estate is liable for a section 6662(a) accuracy-related penalty due to negligence or a disregard of rules or regulations.[1]

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  Victoria E. Dieringer (decedent) lived in Oregon at the time of her death.  She died unexpectedly on April 14, 2009.  Her son Eugene Dieringer (Eugene) was appointed executor of the estate.  Eugene resided in Oregon at the time the petition was filed.

Family and Business Background

Decedent married Robert E. Dieringer, and they had 12 children, including Eugene, Patrick Dieringer (Patrick), and Timothy Dieringer (Timothy).

---

[1]In conjunction with respondent's adjustment to the charitable contribution deduction, there is a computational adjustment to reflect the net gifts to other charities.

Decedent and her husband owned a grocery retail store. Decedent and some family members also owned Dieringer Properties, Inc. (DPI), a closely held real property management corporation that manages a combination of commercial and residential properties in Portland, Oregon. DPI also owns and manages a Wendy's restaurant property in Texas. DPI primarily earns rental income with ancillary income generated from loans provided to developers or builders.

Decedent was chairman of the board of directors (board), vice president, and a shareholder of DPI. She actively participated in board and officer's meetings. Eugene is president, a director, and a shareholder of DPI. He became president shortly after his father died in 2007. Patrick is executive vice president, secretary, and a shareholder of DPI. His responsibilities include managing and overseeing maintenance of the residential properties. Timothy is DPI's office manager. His primary responsibilities include managing the accounts payable and the accounts receivable. Patrick and Timothy were also directors of DPI at the time of decedent's death. No other siblings were involved in DPI in any capacity. Thomas Keepes was the only additional director.

Before her death, decedent was a majority shareholder, owning 425 out of 525 voting shares and 7,736.5 out of 9,220.5 nonvoting shares. The only other

shareholders were Eugene and Patrick. Eugene owned 100 voting shares, and Eugene and Patrick each owned 742 nonvoting shares.

Decedent's Estate Plan

Decedent and her husband planned their estates together with the assistance of an attorney. On November 10, 2000, decedent and her husband created the Victoria Evelyn Dieringer Trust (trust) and their wills. Decedent created an irrevocable life insurance trust that distributed proceeds to her children upon her death. Decedent's husband also carried a life insurance policy separate from the irrevocable life insurance trust. Eugene received proceeds from this life insurance policy upon his father's death.

Decedent's will, dated November 10, 2000, left her entire estate to the trust. Under the terms of the trust agreement, as amended on April 22, 2005, $600,000 went to various charitable organizations and decedent's children received minor amounts of decedent's personal effects. The $600,000 was bequeathed as follows:

| Charity | Specific bequest |
| --- | --- |
| Mt. Angel Abbey | $100,000 |
| Holy Name Sisters | 100,000 |
| St. Ignatius Catholic Church | 100,000 |
| Gonzaga University | 100,000 |

| | |
|---|---|
| St. Andrews School | 100,000 |
| Society of the Little Flower | 50,000 |
| Our Lady of Guadalupe Trappist Abbey | 50,000 |

The trust agreement states the following about taxes:

> All estate, inheritance, legacy, succession or transfer taxes, and interest and penalties thereon, imposed or made payable by reason of the Trustor's death whether on account of property in or passing into any trust created by this Agreement on Trustor's death shall be paid and apportioned in the manner provided by Oregon law.

Eugene was sole trustee of the trust. Patrick and Mr. Keepes served as advisory trustees.

None of decedent's children received monetary proceeds under the terms of decedent's will or the trust agreement. The trust agreement directed that the remainder of decedent's estate, consisting primarily of DPI stock and promissory notes, was to pass to the foundation.

Date-of-Death Appraisal

The estate's law firm requested that Lewis Olds & Associates perform an independent appraisal. The appraisal, addressed to the estate's attorney, explained that "[i]t is our understanding that this appraisal will be used for estate administration purposes." The appraisal valued decedent's DPI voting and nonvoting shares at $14,182,471 as of decedent's date of death. Eugene provided

all documents necessary to perform the appraisal and did not withhold or refuse any requests for information.

At the time of the appraisal DPI was a C corporation. Decedent owned 81% (425/525) and Eugene owned 19% (100/525) of DPI's voting shares. Decedent also owned 84% (7,736.5/9,220.5) of DPI's nonvoting shares. Eugene and Patrick each owned 8% (742/9,220.5) of DPI's nonvoting shares. The appraisal valued the voting stock at $1,824 per share with no applicable discount because they were voting shares and represented a controlling interest. The appraisal valued the nonvoting stock at $1,733 per share, including a 5% discount to reflect the lack of voting power at shareholder meetings. The adjusted net asset value of DPI was $17,777,626 as of decedent's date of death.

The Redemption Arrangement

Antemortem Events

Before decedent's death, DPI's shareholders discussed potentially buying some of decedent's DPI stock. In a board resolution dated November 24, 2008, DPI's board discussed a future purchase of decedent's stock. Specifically, the resolution stated:

> DISCUSSION: The Corporation's executives have reviewed and discussed at some length, and in collaboration with an attorney and other parties, issues around succession planning and perpetuity of the

Corporation. For many and varied reasons, the executives and directors agree that possible alternate or augmented courses of action should be investigated and analyzed to assure that the best succession plan is in place. One action item discussed with Victoria E. Dieringer, and to which she is completely agreeable, is to purchase some or all of her shares of stock, and terminate the deferred compensation plan.

\* \* \* \* \* \* \*

RESOLVED FURTHER: the Corporation agrees to periodically purchase from Victoria E. Dieringer some or all of her Dieringer's Properties, Inc. corporate stock, specifically beginning with those shares inherited by Victoria E. Dieringer from Robert E. Dieringer, based on a mutually accepted agreement between the parties.

In DPI's report of its annual board meeting dated February 13, 2009, the board confirmed that decedent had indicated a desire to potentially move forward with a future purchase of her shares by DPI. At the time of decedent's death on April 14, 2009, there was no discussion regarding the number of shares to be redeemed or the share price to be paid. Decedent did not consent to a redemption of her shares, and there was no redemption agreement in place.

Postdeath Events

Effective November 30, 2009, DPI elected S corporation status. DPI's board decided to elect S corporation status in order to accomplish long-term corporate tax planning. The board wanted DPI to avoid the section 1374 built-in gains tax on corporate assets. The board also wanted the foundation, as owner of

shares in an S corporation, to avoid being subject to the unrelated business income tax pursuant to section 512(e)(1). Mr. Keepes, a director for DPI and an advisory trustee for the foundation, made the initial suggestion for the S election. Mr. Keepes is not a family member or an employee of DPI.

The board became aware that, pursuant to section 4942, the foundation would be required to make annual minimum distributions of at least 5% of the value of its assets. Eugene, as trustee of the foundation, was concerned that merely owning decedent's bequeathed DPI shares would not provide the foundation sufficient cashflow necessary to make the requisite 5% annual distribution. Eugene and DPI's board were also concerned that pursuant to section 4943, the foundation could be subject to tax on the value of any excess business holdings in DPI held by the foundation after five years.

After consultations with an outside attorney and discussions among the board, DPI believed a redemption would allow it to freeze the value of its shares into a promissory note, mitigating the risk of a continual decline in the stock's value in the year's poor economic climate. A redemption also made the foundation a preferred creditor to DPI so that, for purposes of cashflow, it had a priority position over DPI's shareholders. In consideration of the foregoing, DPI determined that decedent's bequeathed shares should be redeemed.

Redemption Transaction

On November 30, 2009, DPI agreed to redeem all of decedent's bequeathed shares--425 voting shares and 7,736.5 nonvoting shares--from the trust. The redemption agreement was between the trust, as the shareholder of decedent's bequeathed stock, and DPI.

Stock ownership before the redemption and subscription was as follows:

| | Shares | |
|---|---|---|
| Shareholder | Voting | Nonvoting |
| Trust | 425 | 7,736.5 |
| Eugene | 100 | 742 |
| Patrick | -0- | 742 |

The redemption agreement priced the voting shares at $779 per share and the nonvoting shares at $742 per share on the basis of a prior 2002 appraisal. It was expected that the prices per share would be reconciled according to the fair market value of the shares as determined by an independent business valuator effective November 30, 2009.

On November 30, 2009, Eugene and Patrick, on behalf of DPI, signed a short-term promissory note for $2,250,000 and long-term promissory note for $3,776,558, both payable to the trust.

On April 12, 2010, DPI and the trust amended and modified the redemption agreement. The modification resulted in DPI's agreeing to redeem all 425 voting shares but only 5,600.5 nonvoting shares. DPI reduced the number of shares it agreed to redeem in order to ensure that it could afford the redemption transaction. The amended redemption agreement allowed for a reconciliation of share prices as determined by an independent business valuator. The redemption appraisal priced the voting stock at $916 per share and the nonvoting stock at $870 per share. On April 12, 2010, the long-term promissory note was amended to $2,968,462, reflecting the amendment to the redemption agreement.

On November 29, 2011, Eugene petitioned the Circuit Court for Multnomah County, Oregon, for the retroactive approval of the redemption. On December 5, 2011, the circuit court approved the petition. Eugene sought approval from the Oregon court to confirm that the redemption would not be a violation of the self-dealing regulations under section 4941. See sec. 4941.

Redemption Appraisal

The estate's lawyer, who also served as DPI's and the foundation's lawyer (DPI's lawyer), hired Lewis Olds & Associates to appraise the DPI stock. The appraisal specified that it provided a valuation of a minority equity interest in DPI as of November 30, 2009. The appraiser's understanding was that the appraisal

would be used for estate administration purposes, including support for the redemption. The appraisal treated DPI as a C corporation. The appraisal, dated March 24, 2010, valued the DPI voting shares at $916 per share and the nonvoting shares at $870 per share. The appraisal of the voting stock included discounts of 15% for lack of control and 35% for lack of marketability. The appraisal of the nonvoting stock included the lack of control and marketability discounts, plus an additional 5% discount for the lack of voting power at stockholder meetings.

Eugene testified that the drop in the value of the DPI shares was the result of a poor business climate. Eugene described DPI's experience as "not a fun time to go through" because the real estate market values were declining. Specifically, Eugene explained that DPI's commercial tenants were requesting rent relief and that vacancies in DPI's residential portfolio were increasing "because of people moving [in] with families or friends consolidating."

The date-of-death valuation did not include the 15% discount for lack of control or the 35% discount for lack of marketability. Although the redemption appraisal did not explain why the discounts were included, Lewis Olds testified that he was instructed to value decedent's bequeathed shares as a minority interest. The appraisal looked at the ownership of DPI's stock before any subscription

agreements. The adjusted net asset value of DPI was $16,159,167 as of November 30, 2009.

Subscription Agreements

At the same time as the redemption, pursuant to subscription agreements, Eugene, Patrick, and Timothy purchased additional shares in DPI in order to infuse the corporation with cash to pay off the promissory notes DPI gave the trust as a result of the redemption transaction. Eugene, Patrick, and Timothy did not indicate an interest in purchasing a particular number of shares or a particular price to be paid for the shares.

Initially, Eugene agreed to purchase 2,695 shares of DPI's nonvoting stock. Eugene amended and modified the agreement, effective November 30, 2009, agreeing to purchase 100 shares of voting stock and 2,190 shares of nonvoting stock for $1,997,568. Eugene purchased the additional shares using the funds from the life insurance policy that he held on his father.

Similarly, Patrick initially agreed to purchase 65 shares of the corporation's voting stock and 86 shares of nonvoting stock for $114,447. Subsequently, Patrick entered into an amendment and modification whereby he purchased the shares for $134,393. Timothy initially agreed to purchase 25 voting shares and

108 nonvoting shares for $99,611. Subsequently, Timothy entered into an amendment and modification whereby he purchased the shares for $116,895.

All three subscription agreements initially priced the voting stock at $779 per share and the nonvoting stock at $742 per share. The initial prices reflect a prior 2002 business valuation. Each subscription agreement included a provision that the purchase prices would be reconciled with a price determined by an independent business valuator to be completed with an effective date of November 30, 2009. After the updated business valuation, the reconciled prices for DPI stock were $916 per share for voting stock and $870 per share for nonvoting stock.

Stock ownership after the redemption and the subscription agreements was as follows:

|  | Shares | |
| Shareholder | Voting | Nonvoting |
| --- | --- | --- |
| Trust | -0- | 2,163 |
| Eugene | 200 | 2,932 |
| Patrick | 65 | 828 |
| Timothy | 25 | 108 |

The Foundation

The foundation was created on November 20, 2000. Effective January 11, 2011, the foundation obtained tax-exempt status as a private foundation under sections 501(c)(3) and 509(a). On January 1, the foundation reported that it had received a noncash contribution of 2,163 nonvoting DPI shares from the trust. On January 24, 2011, the trust assigned the amended long-term promissory note and the short-term promissory note that it received from DPI in the redemption transaction to the foundation.

Foundation Tax Return

On its Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation, for the taxable year 2011, the foundation reported that it had received a noncash contribution of DPI stock with a fair market value $1,858,961; a long-term note receivable with a fair market value of $2,921,312; and a short-term note receivable with a fair market value of $2,250,000. The return lists January 1, 2011, as the date the foundation received all three of these noncash contributions.

Trust Tax Return

On its Form 1041, U.S. Income Tax Return for Estates and Trusts, for the taxable year ending December 31, 2009, the trust reported a capital loss of

$385,934 for the sale of the 425 shares of DPI voting stock.  Also on its Form 1041 for the taxable year ending December 31, 2009, the trust reported a capital loss of $4,831,439 for the sale of the 5,600.5 shares of DPI nonvoting stock.

Estate Tax Return

On Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, filed on July 12, 2010, the estate reported no estate tax liability.  The estate claimed a charitable contribution deduction of $18,812,181.  The amount of the claimed charitable contribution deduction included the date-of-death value of decedent's DPI shares.

The notice of deficiency, dated September 17, 2013, reduced the allowable charitable contribution deduction to reflect the promissory notes and a fraction of the nonvoting shares of DPI stock decedent owned at the time of her death.

OPINION

I.    Burden of Proof

Generally, taxpayers bear the burden of proving that the Commissioner's determinations in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof may shift to the Commissioner if the taxpayers establish that they complied with the requirements

of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests.

The estate claims that it meets the requirements of section 7491(a) to shift the burden of proof to respondent regarding the value of decedent's property bequeathed to the foundation. The resolution of this issue, however, does not depend on which party has the burden of the proof. We resolve this issue on the preponderance of the evidence in the record. See Estate of Bongard, 124 T.C. 95, 111 (2005).

II.     Statutory Framework

Section 2001(a) taxes the transfer of the taxable estate of any decedent who is a U.S. citizen or resident. The taxable estate is the value of the decedent's gross estate less applicable deductions. See secs. 2031(a), 2051.

A.     Section 2031

Section 2031 generally provides that the value of the decedent's gross estate includes the fair market value of all property, wherever situated, at the time of her death. See sec. 20.2031-1(b), Estate Tax Regs. The value of stocks is the fair market value per share on the applicable valuation date. Id. sec. 20.2031-2(a).

Fair market value is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all the relevant facts

and neither person being under compulsion to buy or sell. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities. Propstra v. United States, 680 F.2d 1248, 1252 (9th Cir. 1982); see also Estate of Bright v. United States, 658 F.2d 999, 1005 (5th Cir. 1981) ("It is apparent from the language of the regulation that the 'willing seller' is not the estate itself, but is a hypothetical seller.").

The "willing buyer/willing seller" test is an objective standard by which to measure fair market value. Propstra, 680 F.2d at 1252. All relevant facts and elements of value as of the applicable valuation date must be considered. Sec. 20.2031-1(b), Estate Tax Regs.

B.    Exception to Section 2031--Alternate Valuation Date

Pursuant to section 2032, property includible in the gross estate is included at its fair market value on the date of the decedent's death unless the executor elects the alternate valuation method. Sec. 20.2031-1(b), Estate Tax Regs. The election to use the alternate valuation method must generally be made on the last estate tax return filed by the executor on or before the due date of the return. Id. sec. 20.2032-1(b). "If the election is made, the alternate valuation method applies to all property included in the gross estate and cannot be applied to only a portion

of the property." Id. The election may be made only if doing so will decrease the value of the gross estate and the sum of the estate tax and the generation-skipping tax payable. Id.

C. Deduction From Value of Gross Estate--Section 2055

In general, a deduction for bequests made to charitable organizations is a type of applicable deduction allowed in calculating a decedent's taxable estate. Id. sec. 20.2055-1(a). A charitable contribution deduction from the gross estate generally is allowed for the value of property included in the decedent's gross estate and transferred by the decedent during her lifetime or by will to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, from which no net earnings inure to a noncharitable private party and which does not participate in political campaigning. Sec. 2055(a)(2); sec. 20.2055-1(a)(2), Estate Tax Regs.

The "date-of-death value generally controls the amount of the charitable [contribution] deduction that is based on the amount that passes to charity." Stephens, Maxwell, Lind & Calfee, Federal Estate and Gift Taxation, para. 5.05[3][a], Westlaw (database current through 2016) (emphasis added). If a trustee has the power to divert property to be transferred for charitable purposes "to a use or purpose which would have rendered it, to the extent that it is subject to

such power, not deductible had it been directly so bequeathed, devised, or given by the decedent", however, the charitable contribution deduction is limited to the portion, if any, of the property that is exempt from the trustee's exercise of the power. Sec. 20.2055-2(b)(1), Estate Tax Regs. For purposes of an option as to the time for valuation of a deduction under section 2055, the Internal Revenue Code cross-references section 2032. See sec. 2055(g)(1).

III.     Value of the Charitable Contribution

A.     Parties' Positions

The estate contends that the applicable valuation date for determining the value of the charitable contribution is the date of death. The estate argues that the date of death is the proper valuation date because it did not elect an alternative date pursuant to section 2032.

The estate also argues that the charitable contribution deduction should not depend upon or be measured by the value received by the foundation. The estate contends that consideration of postdeath events that may alter the valuation of property would not truly reflect the fair market value of decedent's assets. The estate further contends that there was neither a plan of redemption nor any other precondition or contingency affecting the value of decedent's charitable bequest.

Respondent argues that the value of the charitable contribution should be determined by postdeath events. Respondent argues that Eugene, Patrick, and Timothy thwarted decedent's intent to bequeath all of her majority interest in DPI or the equivalent value of the stock to the foundation. Specifically, respondent contends that the manner in which Eugene solicited the two appraisals, as well as the redemption of decedent's controlling interest at a minority interest discount, indicate that Eugene and his brothers never intended to effect decedent's testamentary plan.

B.    Analysis

Respondent does not dispute that the applicable valuation date is decedent's date of death. Indeed, respondent agrees that the estate tax is an excise tax upon a transfer of property at death and that determining the amount of the estate tax due begins with a determination of the value of all property held by decedent at her death. See Ahmanson Found. v. United States, 674 F.2d 761, 767 (9th Cir. 1981) ("It is undisputed that [the gross estate's] value is to be determined at the moment of death."). Respondent also agrees that the estate did not elect an alternative valuation date per section 2032.

The parties dispute the value of the charitable contribution. A charitable contribution deduction from the gross estate is allowed for the value of property

included in the decedent's gross estate that passed to a charitable organization. Sec. 20.2055-1(a)(2), Estate Tax Regs.

Normally, absent a section 2032 election, the date-of-death value determines the amount of the charitable contribution deduction, which is based on the value of property transferred to the charitable organization. See generally sec. 2055(d) (the amount of the charitable contribution deduction "shall not exceed the value of the transferred property required to be included in the gross estate"); sec. 2055(g)(1). There are circumstances, however, where the appropriate amount of a charitable contribution deduction does not equal the contributed property's date-of-death value. See, e.g., Ahmanson Found., 674 F.2d at 772 ("The statute does not [necessarily] ordain equal valuation as between an item in the gross estate and the same item under the charitable deduction.").

Numerous events occurred after decedent's death but before decedent's property was transferred to the foundation that changed the nature and reduced the value of decedent's charitable contribution. On November 30, 2009, DPI elected S corporation status. On the same date, DPI agreed to redeem all of decedent's bequeathed shares from the trust. On April 12, 2010, DPI and the trust amended and modified the redemption agreement. The modification resulted in DPI's agreeing to redeem all 425 voting shares but only 5,600.5 nonvoting shares from

the trust. Eugene and Patrick, on behalf of DPI, signed a short-term promissory note for $2,250,00 and a long-term promissory note for $2,968,462 (as amended).

Additionally, using an effective date of November 30, 2009, Eugene, Patrick, and Timothy signed subscription agreements, purchasing additional shares in DPI for $916 per voting share and $870 per nonvoting share. Finally, on January 24, 2011, the trust transferred the short-term promissory note and the long-term promissory note (as amended). The foundation reported receiving additional nonvoting DPI stock on its 2011 tax return.

The estate contends that the foregoing subsequent events occurred for business purposes and should not affect the amount of decedent's charitable contribution. The subsequent events do appear to have been done for valid business purposes. Mr. Keepes, a director of DPI and advisory trustee for the foundation, suggested that DPI elect S corporation status in order to avoid the section 1374 built-in gains tax on corporate assets. Additionally, after consulting an outside attorney, DPI believed that a redemption would allow it to freeze the value of its shares into a promissory note, which would mitigate the risk of a continual decline in stock value during the year's poor economic climate. A redemption also made the foundation a preferred creditor to DPI so that, for purposes of cashflow, it had a priority position over DPI's shareholders. Eugene,

Patrick, and Timothy purchased additional shares in DPI in order to infuse the corporation with cash to pay off the promissory notes that DPI gave the trust as a result of the redemption.

DPI's lawyer hired Lewis Olds & Associates to perform an appraisal of the DPI stock for purposes of determining the date-of-death value of decedent's property. The date-of-death appraisal valued decedent's DPI voting stock at $1,824 per share and her DPI nonvoting stock at $1,733 per share. The nonvoting stock appraisal included a 5% discount for the lack of voting power at stockholder meetings. The appraisal, however, did not include any discounts for lack of control or marketability.

Lewis Olds & Associates was also hired to perform an appraisal of decedent's bequeathed shares for purposes of the redemption. The March 24, 2010, appraisal valued decedent's DPI stock as of November 30, 2009, at $916 per voting share and $870 per nonvoting share. Mr. Olds credibly testified that he was specifically instructed to value decedent's DPI stock as a minority interest. The valuation of the voting stock included a 15% discount for lack of control and a 35% discount for lack of marketability. The nonvoting stock appraisal included the lack of control and marketability discounts plus an additional 5% discount for the lack of voting power at stockholder meetings. The appraisal, however, did not

explain why these discounts were included. Decedent's bequeathed majority interest in DPI therefore was appraised at a significantly higher value only seven months before the redemption transactions without explanation.

Even though there were valid business reasons for the redemption and subscription transactions, the record does not support a substantial decline in DPI's per share value. Eugene testified that the precipitous drop in the value of the DPI shares was the result of a poor business climate. The evidence does not support a significant decline in the economy that resulted in a large decrease in value in only seven months. The adjusted net asset value of DPI was only $1,618,459 higher in the April appraisal. The reported decline in per share value was primarily due to the specific instruction to value decedent's majority interest as a minority interest with a 50% discount.

Given that intrafamily transactions in a close corporation receive a heightened level of scrutiny, Eugene's roles need to be examined. Harwood v. Commissioner, 82 T.C. 239, 258 (1984), aff'd without published opinion, 786 F.2d 1174 (9th Cir. 1986); Holden v. Commissioner, T.C. Memo. 2015-83; Alpert v. Commissioner, T.C. Memo. 2014-70. Eugene, as executor of the estate and, president, director, and a shareholder of DPI, instructed DPI's attorney to inform the appraiser that decedent's bequeathed shares should be valued as a minority

interest. Eugene was also sole trustee of the trust and the foundation, with Patrick serving as advisory trustee. Decedent's majority interest therefore was redeemed for a fraction of its value without any independent and outside accountability. Eugene and his brothers altered decedent's testamentary plan by reducing the value of the assets eventually transferred to the foundation without significant restraints.

We do not believe that Congress intended to allow as great a charitable contribution deduction where persons divert a decedent's charitable contribution, ultimately reducing the value of property transferred to a charitable organization. This conclusion comports with the principle that if a trustee "is empowered to divert the property * * * to a use or purpose which would have rendered it, to the extent that it is subject to such power, not deductible had it been directly so bequeathed * * * the deduction will be limited to that portion, if any, of the property, or fund which is exempt from an exercise of the power." Sec. 20.2055-2(b)(1), Estate Tax Regs. Eugene and his brothers thwarted decedent's testamentary plan by altering the date-of-death value of decedent's intended donation through the redemption of a majority interest as a minority interest.

The trust did not transfer decedent's bequeathed shares nor the value of the bequeathed shares to the foundation. Accordingly, we hold that the estate is not

entitled to the full amount of its claimed charitable contribution deduction. Respondent's determination is sustained.

IV.     Reduction of Other Charitable Gifts

Because we have sustained respondent's determination regarding the amount of the charitable contribution deduction that the estate is entitled to, the estate will owe additional estate tax.  Whether respondent properly reduced the amount of the charitable contribution deduction for decedent's bequests to specific charities other than the foundation is computational only.

V.      Accuracy-Related Penalty

Respondent determined that the estate is liable for an accuracy-related penalty pursuant to section 6662(a) for the tax year in issue.  Section 6662(a) imposes a penalty in an amount equal to 20% of the portion of an underpayment attributable to negligence or disregard of rules or regulations within the meaning of subsection (b)(1).

The Commissioner bears the burden of production regarding the taxpayer's liability for the penalty.  Sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once the Commissioner has met this burden, the taxpayer must provide persuasive evidence that the Commissioner's determination was erroneous.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447.

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, to exercise due care, or to do what a reasonable and prudent person would do under the circumstances.  Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985); sec. 1.6662-3(b)(1), Income Tax Regs.  Respondent established that the estate not only failed to inform the appraiser that the redemption was for a majority interest, but also instructed the appraiser to value the redeemed DPI stock as a minority interest.  Respondent has shown that the estate was negligent.

The estate is therefore liable for the accuracy-related penalty unless it can show it had reasonable cause for and acted in good faith regarding the underpayment.  See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.  The determination of whether the taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  For purposes of section 6664(c), a taxpayer may establish reasonable cause and good faith by showing a reliance on professional advice.  Id. A taxpayer relies reasonably on professional advice if it proves the following by a preponderance of the evidence:  (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good

faith on the adviser's judgment.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

The estate contends that it relied upon the advice of counsel and that its position in the estate tax return is amply supported by caselaw.  We disagree. DPI's lawyer, who also served as decedent's attorney for over 30 years, is a competent professional who had sufficient experience to justify reliance.  DPI's lawyer also likely had all necessary and accurate information to render his advice. Indeed, he knew about all the relevant parties and probably did not need to assume any facts (or law).  Nonetheless, the estate did not actually rely in good faith on its lawyer's judgment.

DPI's lawyer's advice regarding the charitable contribution deduction was based on an errant appraisal.  The date-of-death appraisal and the redemption appraisal--performed only seven months apart--differed substantially in value. The estate knew that a significant percentage of the value of decedent's bequeathed shares was not passing to the foundation and that Eugene and his brothers were acquiring a majority interest in DPI at a discount.

The estate's position is also not amply supported by caselaw.  None of the cases the estate cites in its briefs stand for the principle that an estate may deduct

as a charitable contribution the date-of-death value of assets that are not actually transferred to the charitable organization. The estate has not shown that it had reasonable cause or acted in good faith.

Accordingly, the estate is liable for the accuracy-related penalty under section 6662(a). Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.