STEPHEN G. WOODSUM AND ANNE R. LOVETT, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18934–09.   Filed June 13, 2011.

In 2006 Ps received gain of $3.4 million upon the termination of a "swap" transaction. P–H was personally involved in terminating the transaction and received from the payor a Form 1099–MISC, Miscellaneous Income, that reported the payment. Ps retained a firm with a lawyer and a certified public accountant to prepare their 2006 income tax return. Ps gave to the firm all the 160-plus information returns they had received from third-party payors, including the Form 1099–MISC reporting the $3.4 million. The 115-page return that the firm prepared reported $29.2 million of adjusted gross income but omitted the $3.4 million from the swap transaction. Ps signed and filed the return. The IRS determined a deficiency of tax (which Ps conceded and paid) and an accuracy-related penalty under I.R.C. sec. 6662(a), which Ps dispute on grounds of "reasonable cause" under I.R.C. sec. 6664(c)(1). *Held*: Ps' reliance on their return preparer did not constitute reasonable cause for their omission of the $3.4 million income item.

*David H. Hopfenberg*, for petitioners.
*Patrick F. Gallagher*, for respondent.

OPINION

GUSTAFSON, *Judge*: This case is before the Court pursuant to section 6213(a)[1] for redetermination of an accuracy-related penalty of $104,295 that the Internal Revenue Service (IRS) determined against petitioners Stephen G. Woodsum and Anne R. Lovett for tax year 2006, pursuant to section 6662(a). The issue for decision is whether petitioners had "reasonable cause" under section 6664(c)(1) for omitting $3.4 million of income from their joint 2006 Federal income tax return.

## *Background*

The parties submitted this case fully stipulated, pursuant to Rule 122. We incorporate by this reference the stipulation of facts filed December 6, 2010, and the associated exhibits.

### *Petitioners' backgrounds*

Petitioners Stephen G. Woodsum and Anne R. Lovett are married. At the time they filed their petition, they resided in New Hampshire.

Ms. Lovett received a bachelor of arts degree from Yale University in 1977, and the stipulated record shows nothing more about her background. Mr. Woodsum received a bachelor of arts degree from Yale University in 1976 and a master's in management from the Kellogg School of Management at Northwestern University in 1979. Mr. Woodsum is the founding managing director of Summit Partners, a private equity investment firm founded in 1984.

Petitioners are not tax experts. But Mr. Woodsum is financially sophisticated, and he has a basic understanding of the taxation of interest income, dividend income, and income from the sale of stocks and bonds.

### *The swap transaction*

In 1998 Mr. Woodsum signed an agreement that undertook a financial transaction that the parties describe as a "ten year total return limited partnership linked swap" (and that we refer to herein as "the swap"). In entering into this trans-

---

[1] Except as otherwise noted, all section references are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

action, Mr. Woodsum was advised by attorney David H. Hopfenberg (who, as we show below, supervised the preparation of the tax return for the year at issue). Mr. Woodsum originally entered into the swap with the London Branch of Bankers Trust Company, but Bankers Trust was succeeded in its interest in the swap by Deutsche Bank. The parties' stipulation explains the swap as follows:

21. The Swap required * * * [Deutsche Bank] to pay Petitioners the value of the Reference Fund less the Calculation Amount on the Termination Date.

22. The Reference Fund was Spring Point Partners, L.P., a Delaware Limited Partnership.

23. According to the terms of the Swap, the Specified Interest in the Reference Fund was "a limited partnership interest in the Reference Fund that would result from a capital contribution to such Reference Fund of USD 2,612,156 on December 31, 1997, if one were to be made."

24. The Swap required Petitioners to make quarterly payments to * * * [Deutsche Bank] based upon the product of the Notional Amount (as adjusted) times the USD–LIBOR–BBA rate plus 1.50% (the "LIBOR Payments"). The agreement further required the Petitioners to provide Collateral to * * * [Deutsche Bank].

After the end of every calendar quarter, petitioners received account statements with respect to the swap showing the total appreciation or depreciation in the value of their interest. They began receiving these quarterly reports at least as early as December 31, 2003 (when petitioners' interest had appreciated to $5,816,401), and until March 31, 2006 (when petitioners' interest had appreciated to $6,368,506). On their returns for the tax years preceding 2006, petitioners reported income and deductions relating to the collateral and LIBOR payments in connection with the swap.

The swap's ten-year term was apparently scheduled to end in early 2008, but Mr. Woodsum believed that the reference fund was not performing as well as it should. He therefore informed Deutsche Bank in writing on February 3, 2006, of his intention to terminate the swap effective March 31, 2006. The net payout to petitioners in connection with the termination of the swap was $3,367,611.50, all of which, the parties agree, was taxable income to petitioners. Mr. Woodsum discussed the termination with Mr. Hopfenberg before it took place, and Mr. Hopfenberg advised Mr. Woodsum when the

swap had been terminated. After the end of 2006, Deutsche Bank issued to petitioners a Form 1099–MISC, Miscellaneous Income, reporting "Other income" of $3,379,611 [2] from the termination of the swap, and a Form 1099–INT, Interest Income, reporting $60,291.69 of "Interest income".

*Petitioners' income in 2006*

In 2006 petitioners received adjusted gross income totaling almost $33 million (including the $3.4 million from terminating the swap). Petitioners' payors reported that income to petitioners and to the IRS on more than 160 information returns, e.g., Schedules K–1 and Forms 1099, including the Deutsche Bank Forms 1099–MISC and 1099–INT.

The $3.4 million reported on Deutsche Bank's Form 1099–MISC was not the largest amount reported on the information returns that petitioners received for 2006. However, if the $3.4 million from Deutsche Bank had been included on petitioners' 2006 return, it would have been the third largest long-term capital gain amount reported as a line item on Schedule D, Capital Gains and Losses.

*Preparation of petitioners' 2006 return*

For 2006 petitioners filed 27 State income tax returns and a joint Federal income tax return.

To prepare their 2006 Federal income tax return, petitioners hired Venture Tax Services, Inc. ("VTS"), a niche firm specializing in tax work for private equity and hedge funds as well as such funds' general partners. VTS employed Mr. Hopfenberg, whom petitioners had retained for investment and tax advice since 1996. As of 2006, Mr. Hopfenberg had more than 20 years of tax compliance and consulting experience, including employment in the tax departments of major accounting firms. For VTS's preparation of petitioners' 2006 return, Mr. Hopfenberg acted as reviewer. The VTS employee charged with actually preparing the return was a Massachusetts certified public accountant ("C.P.A.") who similarly had more than 20 years of tax compliance experience, including employment with major accounting firms.

---

[2] The Deutsche Bank Form 1099–MISC shows an amount of $3,379,611, but the parties have stipulated that the net payout (and the taxable income) was $3,367,611.50. The discrepancy is not explained in the record. For purposes of discussion in this Opinion hereafter, we round the number to $3.4 million.

Petitioners provided to VTS all 160-plus information returns, including the Deutsche Bank Form 1099–MISC reporting $3.4 million from the termination of the swap and Form 1099–INT reporting $60,291.69 of interest income. VTS duly scanned the Form 1099–MISC into its records for use in preparing the return.

The Form 1040, U.S. Individual Income Tax Return, that VTS prepared for petitioners was 115 pages long. The return did report the $60,291.69 of interest income that petitioners received from Deutsche Bank. However, for reasons the record does not show,[3] the return that VTS prepared did not include the $3.4 million that Deutsche Bank paid and reported. If the $3.4 million had been included on the return, that amount would have appeared on Schedule D as a distinct line item in Part II, "Long-Term Capital Gains and Losses—Assets Held More Than One Year". But, again, it was not reported on the return that VTS prepared.

*Review and signing of petitioners' 2006 return*

Petitioners had obtained an extension of the due date for filing their 2006 return. As a result, the return was due October 15, 2007. At 11 a.m. on that date, petitioners met with Mr. Hopfenberg to discuss several subjects, including their return. At that meeting Mr. Hopfenberg turned the 115 pages of the return and discussed various items of income and deduction with Mr. Woodsum. Petitioners characterize this as their "perform[ing] more than a cursory review of the return." However, the parties have stipulated that petitioners do not recall—

• which specific items of income and deduction were discussed at the meeting, or

• the amount of time they spent reviewing the return, or

• the amount of time they spent reviewing the Schedule D and the attachments and statements thereto.

During the discussion of the return, Mr. Woodsum did not compare or match the items of income reported on the Form 1040 and its schedules with the information returns that the third-party payors had provided. Consequently, petitioners

---

[3] In their briefs petitioners seem to imply that the omission was the result of mistake or oversight by the C.P.A. who prepared the return. However, the stipulation does not state the reason for the omission, and because petitioners chose to submit the case under Rule 122, they did not call the C.P.A. as a witness. Thus, we do not know why the $3.4 million was omitted.

failed to make sure that all their income items were reported on the return that VTS had prepared.

Petitioners signed the return on that same day—October 15, 2007. We assume that, when they did so, petitioners were unaware of the omission of the $3.4 million. [4]

The IRS received Deutsche Bank's Form 1099–MISC reporting the $3.4 million, compared it with petitioners' return, and determined a deficiency in tax of $521,473 and an accuracy-related penalty under section 6662(a) of $104,295. Petitioners agreed to the assessment of tax in the amount determined by the IRS. As a result, their tax due, which they reported as $3,719,454, was actually $4,240,927. Petitioners paid the tax deficiency plus interest.

However, petitioners filed their petition in this Court disputing the accuracy-related penalty. The parties jointly submitted the case fully stipulated under Rule 122.

## Discussion

### I. *The relevant law*

#### A. *Accuracy-related penalty under section 6662(b)(2)*

Section 6662(a) and (b)(2) imposes an "accuracy-related penalty" of 20 percent of the portion of the underpayment of tax attributable to any substantial understatement of income tax. [5] By definition, an understatement of income tax for an individual is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6662(d)(1). Under section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in

---

[4] Petitioners argue in their brief that "Neither the tax advisor nor the Petitioners noticed that the tax preparer failed to include the Deutsche Bank 1099–MISC which showed income of $3,379,611.00 on the return"; but no evidence in the record explicitly asserts that petitioners were unaware of the omission. The closest assertion is the parties' stipulation that "Petitioners relied upon Venture Tax Services to prepare their 2006 tax return and include all of the items relating to the over 160 information returns provided to Venture Tax Services on said return." For purposes of this Opinion, we interpret this stipulation in the manner most favorable to petitioners—an approach admittedly at odds with the fact that they have the burden to prove reasonable cause and good faith, as we show below.

[5] Under section 6662(b)(1), the accuracy-related penalty is also imposed where an underpayment is attributable to the taxpayer's negligence or disregard of rules or regulations; and respondent argues that petitioners' omission of the income reflects negligence. However, as we show below, respondent has demonstrated that petitioners substantially understated their income tax for 2006. Thus, we need not consider whether, under section 6662(b)(1), it is also true that petitioners were negligent or disregarded rules or regulations.

a given case. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); *Higbee v. Commissioner*, *supra* at 447.

B. *Reasonable cause under section 6664(c)(1)*

A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he can show, under section 6664(c)(1), that he had reasonable cause for a portion of the underpayment and that he acted in good faith with respect to that portion. [6] The pertinent regulation provides:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith. * * * Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * * [26 C.F.R. sec. 1.6664–4(b)(1), Income Tax Regs.]

Whether the taxpayer acted with reasonable cause and in good faith thus depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional.

II. *Application of the law to petitioners*

A. *Substantial understatement*

The undisputed tax deficiency attributable to petitioners' omitted income is $521,473. That amount is obviously in excess of $5,000. That amount is also in excess of "10 percent

---

[6] There are other defenses to the penalty that petitioners do not invoke here; i.e., section 6662(d)(2)(B) provides that an understatement may be reduced, first, where the taxpayers had substantial authority for their treatment of any item giving rise to the understatement or, second, where the relevant facts affecting the item's treatment are adequately disclosed and the taxpayers had a reasonable basis for their treatment of that item. Neither of those defenses is applicable here, where petitioners admit that the income was taxable and simply allege an inadvertent omission from the return.

of the tax required to be shown on the return", sec. 6662(d)(1), because the correct tax liability, which petitioners have conceded, is $4,240,927. Petitioners' understatement of tax was therefore "substantial" for purposes of section 6662(d)(1). Consequently, respondent has carried the burden of production that section 7491(c) imposes.

The accuracy-related penalty is mandatory; the statute provides that it "shall be added". Sec. 6662(a). Petitioners bear the burden of proving the defense of reasonable cause and good faith. See *Higbee v. Commissioner*, *supra* at 446.

B. *Reasonable cause and good faith*

1. *Reliance on professional advice*

For purposes of section 6664(c), a taxpayer may be able to establish reasonable cause and good faith (and thereby avoid the accuracy-related penalty of section 6662) by showing his reliance on professional advice. 26 C.F.R. sec. 1.6664–4(b)(1). As we stated in *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002):

for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Seeking to meet these standards, petitioners assert (1) that VTS and its attorney and C.P.A. were competent and experienced professionals, (2) that petitioners provided VTS with the necessary and accurate information, i.e., the Form 1099–MISC reporting the $3.4 million, and (3) that petitioners relied on VTS to prepare the return and report the $3.4 million—all of which the parties have stipulated. However, for purposes of proving reliance on professional advice, these assertions miss the mark.

The IRS's regulations define "advice" as follows:

(2) *Advice defined.*—Advice is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the tax-

payer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty. Advice does not have to be in any particular form. [26 C.F.R. sec. 1.6664–4(c)(2).]

A premise only implicit in petitioners' position is that their return preparer's unexplained omission (i.e., the omission of what Mr. Woodsum knew to be includable as a substantial income item on their return) constituted "advice" to exclude that item. However, the fact that the regulation defines "advice" broadly enough to include "any communication", whether or not "in any particular form", provides no grounds for reliance by petitioners: In *United States v. Boyle*, 469 U.S. 241 (1985), where the taxpayer knew or should have known of the applicable filing deadline, he lacked reasonable cause for his attorney's untimely filing of his return; similarly, since petitioners knew their Form 1099 income should have been included, they lack reasonable cause for their preparer's failure to include the income.

In order to constitute "advice" within the definition of the regulation, the communication must reflect the adviser's "analysis or conclusion". The taxpayer must show (in the words of *Neonatology Associates*, 115 T.C. at 99 (emphasis added)) that he "relied in good faith on the adviser's *judgment*." Petitioners present no testimony of the preparer (nor any other evidence) to show that the income was omitted from the return because of any "analysis or conclusion" or "judgment" by VTS that the income was not taxable. When the Supreme Court discussed the "reasonable cause" defense in *Boyle*, it characterized the relevant professional role as giving "substantive advice", 469 U.S. at 251, and contrasted that professional function with things that "require[ ] no special training", *id.* at 252. No "special training" was required for Mr. Woodsum to know that the law required him to include on that return an item of income that he had received and that Deutsche Bank had reported on Form 1099. The including of that income on their tax return is what petitioners say they intended when they handed over their information returns to VTS.

Petitioners make no suggestion that VTS gave them "substantive advice" to omit the $3.4 million or that petitioners relied on any such substantive advice. On the contrary, petitioners stipulated that they "relied upon Venture Tax Serv-

ices to prepare their 2006 tax return *and include all of the items* relating to the over 160 information returns provided to Venture Tax Services on said return". (Emphasis added.) There is no evidence that when VTS instead omitted the $3.4 million, it thereby was exercising "analysis" or "judgment" or was making a professional recommendation to petitioners; rather, it was failing, in that specific instance, to carry out petitioners' general instruction. In signing the return thus erroneously prepared, petitioners were not deliberately following substantive professional *advice*; they were instead unwittingly (they contend) perpetuating a clerical mistake. The defense of reliance on professional advice has no application here.

2. *Return preparer's error*

More pertinent to this case is the principle, quoted above, that "[a]n isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith." 26 C.F.R. sec. 1.6664–4(b)(1). However, petitioners fail to place their understatement within the category of "computational or transcriptional error[s]" because they provided no evidence to explain the nature of or the reason for VTS's omission of the $3.4 million. It may be (and petitioners seem to expect the Court to assume) that the omission was the result of the C.P.A.'s oversight of one Form 1099 amid 160 such forms, but no actual evidence supports that characterization. The omission is unexplained, and since petitioners have the burden to prove reasonable cause and good faith, this evidentiary gap works against their defense.

Even if we assume that the $3.4 million omission was an innocent oversight by the return preparer, the reasonable cause defense is unavailing here. Taxpayers sometimes do avoid the accuracy-related penalty by showing that their understatement was the result of a return preparer's error. See, e.g., *Thrane v. Commissioner*, T.C. Memo. 2006–269, 92 T.C.M. (CCH) 501.[7] However, as we stated in *Metra Chem*

---

[7] In *Thrane*,

The erroneous income figure for Windsor ($414,845) appeared only on a worksheet to the Schedule E attached to petitioner's Form 1040. That figure required a further offsetting adjustment before being reported on the face of the Schedule E as $378,428. Thus, only a rather detailed tracing through the Schedule E worksheet would have alerted petitioner to the error at issue. * * *  [92 T.C.M. (CCH) at 503.]

*Corp. v. Commissioner*, 88 T.C. 654, 662 (1987) (citations omitted):

As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer. As the petitioners have noted, this Court has declined to sustain the addition to tax under section 6653(a) in cases in which the taxpayer relied in good faith on the advice of a tax expert. However, a close examination of these cases reveals that they raised questions as to the tax treatment of complex transactions and that the position taken on the returns with respect to such items had a reasonable basis.

This case presents no such difficult issues. Ronald Laroche simply failed to report over $10,000 in cash dividends which he received from corporations controlled by him. Richard Laroche similarly failed to report over $6,800 in such dividends. The unreported dividends constituted over 21 percent of Ronald and Beverly Laroche's gross income for 1977 and over 20 percent of Richard and Shirley Laroche's gross income for such year. We believe that such a substantial underreporting of income would not have gone unnoticed if the petitioners had made even a cursory review[8] of their returns. Under such circumstances, the petitioners may not shift responsibility for the accuracy of their returns to their accountant.

However complex the swap may have been in its creation and its operation, its termination resulted in Deutsche Bank's issuing to petitioners a standard and uncomplicated Form 1099–MISC that, petitioners admit, should have resulted in a distinct and identifiable entry on Schedule D of their return. Like *Metra Chem*, "This case presents no such difficult issues." *Id.*

"Even if all data is furnished to the preparer, the taxpayer still has a duty to read the return and make sure all income items are included." *Magill v. Commissioner*, 70 T.C. 465, 479–480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981). [9] We do not hold that a taxpayer must duplicate the work of his return preparer, or that any omission of an income item in

---

In this case, however, the facts are quite different, in that the $3.4 million figure on the Form 1099–MISC should simply have appeared as a distinct and visible entry on Schedule D.

[8] We thus observed in *Metra Chem* that a "cursory review" would have disclosed the underreporting in that case. Petitioners attempt to construe this passage in the *Metra Chem* Opinion as announcing a rule that the reasonable cause defense requires only a "more than cursory review". *Metra Chem* does not state this low standard. As we explain below, what is required for "reasonable cause" is that the taxpayer conduct a review the purpose of which is to "make sure all income items are included." *Magill v. Commissioner*, 70 T.C. 465, 479–480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981).

[9] See also *Bailey v. Commissioner*, 21 T.C. 678, 687 (1954) ("The duty of filing accurate returns cannot be avoided by placing responsibility upon an agent. The fact that petitioner told the person who made up the partnership return about the sale of leasehold interests totaling $83,500 cannot excuse his failure to read the return and ascertain the inclusion of this item.").

a return prepared by a third party is necessarily fatal to a finding of reasonable cause and good faith on the taxpayer's part. Rather, for purposes of this Opinion, we assume that the reasonable cause defense may be available to a taxpayer who conducts a review of his third-party prepared return with the intent of ensuring that all income items are included, and who exerts effort that is reasonable under the circumstances, but who nonetheless fails to discover an omission of an income item.

Mr. Woodsum, however, makes no showing of a review reasonable under the circumstances. He personally ordered the termination that gave rise to the income; he received a Form 1099–MISC reporting that income; that amount should have shown up on Schedule D as a distinct item; but it was omitted. The parties stipulated that petitioners' "review" of the defective return was of an unknown duration and that it consisted of the preparer's turning the pages of the return and discussing various items. Petitioners understated their income by $3.4 million—an amount that was substantial not only in absolute terms but also in relative terms (i.e., it equaled about 10 percent of petitioners' adjusted gross income). A review undertaken to "make sure all income items are included" (in the words of *Magill*)—or even a review undertaken only to make sure that the *major* income items had been included—should, absent a reasonable explanation to the contrary, have revealed an omission so straightforward and substantial.

In evaluating reasonable cause, "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. sec. 1.6664–4(b)(1). But petitioners do not recall how much time they spent reviewing the return, how much time they spent reviewing Schedule D, or which income items they reviewed; and they recall that they did *not* compare or match the items of income reported on the return with the information returns they had received. They have thus failed to prove the "most important factor"— i.e., "the taxpayer's effort". Petitioners did not fulfill their duty to review the return that VTS had prepared.

Mr. Woodsum terminated the swap ahead of its set termination date because his watchful eye noted that it was not performing satisfactorily as an investment. That is, when his own receiving of income was in question, Mr. Woodsum was

evidently alert and careful. But when he was signing his tax return and reporting his tax liability, his routine[10] was so casual that a half-million-dollar understatement of that liability could slip between the cracks. We cannot hold that this understatement was attributable to reasonable cause and good faith.

To reflect the foregoing,

*Decision will be entered for respondent.*

—————

[10] By way of analogy, 26 C.F.R. sec. 1.6664–4(b)(1) suggests that an error on a corporate return, arising from "data compiled by the various divisions of a multidivisional corporation", may result from reasonable cause "provided the corporation employed internal controls and procedures, reasonable under the circumstances, that were designed to identify such factual errors." Petitioners here lacked "controls and procedures, reasonable under the circumstances".