T.C. Memo. 2018-196

UNITED STATES TAX COURT

ESTATE OF LYDIA RAMIREZ, DECEASED, ROWENA L. RAMIREZ,
SPECIAL ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 10052-12.                    Filed November 28, 2018.

Framta Saechao and Robert L. Goldstein, for petitioner.

Amy Chang, Gregory Michael Hahn, and Timothy Froehle, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: Lydia Ramirez owned and operated several businesses,

primarily through S corporations. She also owned many rental properties. The

businesses mostly made money while the rental properties mostly lost it. On her

**[\*2]** 2008 and 2009 tax returns, Ramirez reported that her businesses produced passive income, which she offset with her rental properties' passive losses. After an audit, the Commissioner reclassified most of Ramirez's business income as active. Ramirez's estate doesn't challenge this reclassification, but does want to change the classification of the rental losses to be active as well. But Ramirez owned several properties and, to make this reclassification work, her estate would have to show she was a "real estate professional" and aggregate the time that she put into them. That the Commissioner also determined penalties against her raises a novel question: When an individual dies after filing her petition but before trial, who has the burden of producing evidence that the penalties were approved in writing by a supervisor--the Commissioner or petitioner's estate?

FINDINGS OF FACT

Ramirez's late husband was in the real-estate business, and he had always dealt with the couple's rental properties. When he died in 2000, however, Ramirez chose to take over. She was a fast learner and swiftly became a successful entrepreneur who owned and ran a number of businesses and invested in several pieces of real estate.

We'll start with a sketch of her holdings in 2008 and 2009.

**[*3]** I.     Non-Real-Estate Businesses

*Truhealth, Inc.*  Ramirez was the sole shareholder of Truhealth, Inc. (Truhealth), an S corporation that ran an assisted-living facility for Alzheimer's and dementia patients.  Truhealth's facility is called Golden Haven, and Ramirez was its administrator.  Truhealth paid Ramirez a salary of more than $70,000 in 2008 and over $90,000 in 2009, which she reported as wages on her returns. Truhealth also had flowthrough business income of more than $250,000 in 2008 and over $100,000 in 2009.  Ramirez reported those amounts as passive income on Schedules E, Supplemental Income and Loss, that she attached to her 2008 and 2009 returns.

*Ranew Corporation.*  Ramirez also wholly owned Ranew Corporation (Ranew), an S corporation that operated a convenience store called Sunrise Food Mart.  Ramirez worked for Ranew, and it paid her a salary of about $50,000 in 2008 and around $70,000 in 2009--amounts that she reported as wages on her returns.  Unlike Truhealth, Ranew had flowthrough business losses in both years-- more than a $200,000 loss in 2008 and around a $20,000 loss in 2009.  Ramirez reported Ranew's flowthrough losses as passive losses on her 2008 and 2009 Schedules E.

**[*4]** *Other Non-Real-Estate Businesses.* Ramirez's 2008 and 2009 returns show that she had a few other non-real-estate businesses in those years. She reported losses for both years on Schedules C, Profit or Loss From Business, for a sole proprietorship called JCCAN, and a loss for 2008 for a sole proprietorship called XEDIA. We haven't learned what XEDIA was; JCCAN was a "biweekly mortgage payoff company" that Ramirez was loosely involved with.[1] Ramirez also reported sizable active losses from a cherry orchard on Schedules F, Profit or Loss From Farming, that she attached to her 2008 and 2009 returns.[2] Finally, she reported on her Schedules E a flowthrough loss in 2008 and flowthrough income in 2009 from a partnership called Lollicup Bay Area LLC. The Commissioner didn't make any determinations about that partnership, and we learned nothing about it at trial.

---

[1] The Commissioner disallowed Ramirez's JCCAN losses under section 183 as losses from an activity not engaged in for profit, and the estate agreed to that adjustment before trial. (All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[2] Ramirez reported her cherry-orchard farming losses as active losses, but the Commissioner disallowed some and determined that the remaining amounts were passive. The estate also agreed to those adjustments before trial.

[*5] II.     Rental Real Estate

Ramirez also owned between 11 and 13 commercial and residential rental properties in 2008 and 2009. We'll describe her commercial properties first.

A.     Commercial Properties

*Belding Building.* Much of the trial testimony was about the Belding Building, a 25,000-square-foot commercial office building in downtown Stockton, California. Ramirez owned the Belding Building through an S corporation called Ramind Corporation (Ramind) that she reported on her Schedules E for 2008 and 2009. She reported almost a $250,000 flowthrough passive loss from Ramind for 2008 and about a $40,000 flowthrough passive loss from it for 2009. The Belding Building underwent substantial renovations during most of the 2008 tax year--of the more than fifty office spaces in the building, only one had a tenant during that year. Ramirez finished the renovations in 2009, but had only five or six tenants by year's end.

*Triad Plaza.* Another property that Ramirez renovated in the years at issue was Triad Plaza--a strip mall with seven units totaling between 1,600 and 1,800 square feet each. There's nothing in the record about whether Ramirez owned this property directly or through an entity, and it doesn't seem to show up on her 2008 and 2009 returns. Ramirez's daughter testified that Triad Plaza had tenants in

**[\*6]** 2008 and 2009, but she didn't say how many. And since we don't see Triad Plaza on Ramirez's tax returns, it's hard to say how she reported it--though the parties did stipulate that Ramirez "treat[ed] her gains and losses from real estate on the Schedule[s] E as passive" for 2008 and 2009.

*Winchester Pavilion.* Ramirez's daughter described Winchester Pavilion as "a strip mall kind of setup." There was no evidence about Winchester Pavilion's tenants in 2008, but we do find that Ramirez had some because she reported over $120,000 in gross rents for this property for that year. Ramirez sold Winchester Pavilion in 2008, but she still reported over $8,000 in expenses for it on her 2009 Schedule E. Ramirez reported all the losses for Winchester Pavilion--including a loss of over $400,000 for 2008--as passive losses on her returns.

*Golden Haven*. Ramirez's daughter testified that Ramirez also owned the building that housed Golden Haven--the assisted-living facility--and rented it out, though she didn't specify to whom. That's all we learned about that rental property at trial, and Ramirez's returns offer no other clues. We therefore do not know how much the rent for the property was, whether she reported income or loss from it, or whether she reported that income or loss as active or passive.

**[\*7]** B.    Residential Properties

*607 and 609 4th Avenue.*  Ramirez jointly owned this property with her son. She didn't report any gross rental income for it on her 2008 Schedule E, though she did still tally an almost $3,000 passive loss for that year.  The property threw off some gross rental income in 2009, but the net passive loss that Ramirez reported for that year was about the same as 2008.  Ramirez claimed a management-fee deduction of almost $4,000 for this property for 2009.

*3749 Turnpike Road.*  Ramirez received gross rental income for this property in 2008 and 2009; after deductions, however, she reported net passive losses for both of those years.  As she did for the 607 and 609 4th Avenue property, Ramirez deducted management fees for this property--the total fees were less, but she deducted them for both years.

*Tulsa, Oklahoma.*  Ramirez had at least three residential properties in Oklahoma.[3]  She reported gross rental income for her Oklahoma properties on her 2008 and 2009 Schedules E, but, once again, the deductions were so large that she had net passive losses for both of those years.  Consistent with the other residential properties we've discussed, Ramirez deducted management fees for her

---

[3] Ramirez's daughter testified that "[t]here may have been four," but she "kn[ew] of three."

[*8] Oklahoma properties for 2008 and 2009. Ramirez's daughter testified: "[S]he had some properties in Oklahoma, so she obviously couldn't handle those by herself. She did have some assistance with that."

*2813 Glen Sharon Way.* This property was vacant in 2008, and Ramirez's son lived in it rent-free in 2009. Ramirez still, however, reported an almost $30,000 passive loss for this property for 2008 and about a $16,000 passive loss for 2009. And, even though her son lived in the property for free in 2009, Ramirez took a $600 management-fee deduction for it for that year.

*5443 Centralia Street.* Ramirez's daughter lived in this property rent-free in 2008, but Ramirez still reported a net passive loss of more than $25,000 for it for that year. This property also produced no gross rental income in 2009, and Ramirez reported a net passive loss for it of almost $9,000 for that year. It seems Ramirez didn't have any tenants for this property in 2009, but she did sign a "Management Rental Agreement" with Taylor Young Real Estate Investments for it in that year.

*8025 Shay Circle.* Ramirez bought this property in 2008, but it wasn't ready to rent until 2009. She reported gross rental income of just under $2,000 for this property in 2009 and a net passive loss of more than $4,500. Ramirez also took a management-fee deduction for this property for 2009.

**[*9]**  In 2008 and 2009 Ramirez reported gobs of passive losses from her

commercial and residential rental properties, several of which she didn't even rent.

Considering the management fees, the "Management Rental Agreement," and her

daughter's testimony, we know, too, that Ramirez had help with these properties.[4]

But what exactly was *she* doing?

III.    Ramirez's Rental Activities

Ramirez was a capable entrepreneur, but myriad health conditions were

slowing her down in 2008 and 2009.  She was suffering from hypertension,

diabetes, emphysema, subclinical congestive heart failure, and diffuse

microvascular disease.  Ramirez had a history of ministrokes, and her daughter--a

physician--credibly testified that her daily routine was hindered by fatigue and a

lack of balance.  "[S]he couldn't walk across this [court]room without getting

winded," and, "[o]n top of that, * * * she had suffered multiple fractures from

different falls that required either a casting or operative intervention."  Despite

Ramirez's serious ailments, she spent many hours each day working on her

---

[4] Ramirez's daughter also testified that two different contractors worked on Ramirez's properties--Tito Petalio on the residential properties and Chris Ennslin on the commercial properties.  She didn't say exactly how much work they did or how much time they spent doing it, but their work doesn't appear to have been insignificant.

[*10] businesses and rental properties.  We find, however, that important parts of her daughter's testimony are not credible.

Ramirez's daughter lived in southern California for all of 2008 and at least half of 2009.  Ramirez lived in northern California during that time.  Her daughter testified, though, that she visited her mother about two to three times per month to help her with work and take her to doctors' appointments.  She also testified that in 2008 she visited her mother between 25 and 30 times and that her average stay was one week to a week and a half.  The frequency and length of Ramirez's daughter's claimed visits in 2008 seem implausible--totaling somewhere between 175 and 315 days[5]--especially since she had a medical research job in southern California at the time.  She testified that she wasn't that busy with her research job, but we still find it hard to believe that she spent as much time with her mother in 2008 as she says she did.

We also find it unlikely that Ramirez--a woman in very poor health--was as active in 2008 and 2009 as her daughter claims she was.  Ramirez's daughter testified that:

---

[5] 7 days x 25 visits = 175 days; 10.5 days x 30 visits = 315 days.

[*11] ●      Ramirez started her work day at 4 or 5 a.m.;

     ●      she worked as the administrator at Golden Haven 3 days a week for 4-6 hours per day;

     ●      she worked for Sunrise Food Mart 1-2 hours per day but not every day;

     ●      she worked on the Belding Building renovations every day for 4-6 hours--Ramirez's daughter claimed that Ramirez did some of this work while she was at Golden Haven;

     ●      she did work associated with Triad Plaza 3-4 days a week for 1-2 hours per day; and

     ●      she did work associated with her residential rental properties about 19-25 hours per month.

That's a demanding schedule, even for someone in good health. The daughter's testimony strains credulity, and that's a problem because her testimony is the only thing the estate offered to prove Ramirez's rental activities. The estate didn't offer any contemporaneous records (e.g., activity logs), and it failed to offer any evidence (e.g., calendars, phone records, invoices, receipts) to corroborate her testimony.[6] We therefore find that the estate has failed to prove the number of hours that Ramirez devoted to *any* of her rental activities in 2008 and 2009.

---

[6] Ramirez apparently prepared activity logs *after* the Commissioner asked for them during the audit, but the estate never offered them into evidence. We therefore don't have the opportunity to consider even those noncontemporary logs here.

**[*12]** IV.    Audit and Trial

The Commissioner audited Ramirez's 2008 and 2009 returns, and he determined that she actively participated in Truhealth and Ranew--the S corporations that ran the assisted living facility and the convenience store. That meant that Truhealth's significant flowthrough income was active, which also meant that Ramirez couldn't deduct her passive rental losses against it. The Commissioner sent Ramirez a notice of deficiency in which he made that determination and also determined accuracy-related penalties. Ramirez, a California resident, timely petitioned our Court. After Ramirez died, her daughter took over the case on behalf of her estate. We tried the case in San Francisco. The Commissioner introduced no evidence at trial that the IRS employee who made the initial penalty determination had written approval from his immediate supervisor.

We need to decide whether Ramirez's rental losses were active and whether she was liable for two section 6662(a) penalties. On the latter issue, we need to decide whether the Commissioner has the burden of producing evidence that the penalties were approved in writing by an IRS supervisor. See sec. 7491(c).

[*13]                                   OPINION

I.      Rental Losses:  Passive or Active?

Sections 162(a) and 212(1) allow taxpayers to deduct most of their business

and investment expenses, but section 469 limits those deductions when they arise

from "passive activities."  A "passive activity" is "any activity * * * which

involves the conduct of any trade or business, and * * * in which the taxpayer does

not materially participate."  Sec. 469(c)(1).  Real-estate rental activities like

Ramirez's in 2008 and 2009 are *per se* passive, sec. 469(c)(2), unless a taxpayer

can prove she is a "real estate professional," see sec. 469(c)(2), (7).  And that is

just what the estate argues Ramirez was in 2008 and 2009, even though her returns

never said so.

        A.      Real Estate Professional

Ramirez was a real-estate professional in 2008 and 2009--and her rental

activities were then not *per se* passive in those years--if:

- more than half of the personal services she performed each of those years were "performed in real property trades or businesses in which * * * [she] materially participate[d], and"

- she performed "more than 750 hours of services during * * * [each of those years] in real property trades or businesses in which * * * [she] materially participate[d]."

**[\*14]** Sec. 469(c)(7)(B).  The Code defines "real property trade or business" to include the renting, operation, and leasing of real estate, sec. 469(c)(7)(C); <u>see</u> sec. 1.469-9(b)(2), Income Tax Regs., and "personal services" are just about any type of work that a person does in connection with her trade or business, sec. 1.469-9(b)(4), Income Tax Regs.  A major exception is for work more typical of an investor--study and review of financial statements, preparation and analysis of financial summaries, and the monitoring of finances.  <u>See</u> <u>id.</u>; sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

We have no trouble finding that Ramirez performed *some* personal services in 2008 and 2009 in connection with her commercial and residential real-estate rental business.  And real-property rentals were also her only real-property trade or business in those years--there's nothing in the record, for example, about her engaging in the trade or business of property development, construction, or reconstruction.[7]  But performance of some personal services in some particular real-property trade or business is only part of what the estate needs to show.  The rest of its burden is harder to shore up--it must prove the amount of time that

---

[7] The Belding Building was substantially renovated during the years at issue, and Ramirez's daughter testified that Ramirez spent a lot of time on those renovations.  We find, however, that the renovations were made only to improve the property, and the estate doesn't argue that Ramirez was in the *trade or business* of construction or reconstruction.

**[*15]** Ramirez herself spent on this activity, and show that it can add the time she spent on separate properties to meet the other regulatory requirements for proof of material participation. We have to ask whether Ramirez materially participated in her rental activities, performed more than half of her personal services in them, and spent more than 750 hours doing so. See sec. 469(c)(7)(B); sec. 1.469-9(c)(1), (3), Income Tax Regs. This is where the foundation of the estate's case starts to crack.

Let's start with "material participation." The Code says that "material participation" means being "involved in the operations of the activity" on a regular, continuous, and substantial basis, sec. 469(h)(1), and the regulations lay out seven ways to prove that, see sec. 1.469-9(b)(5), Income Tax Regs; sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). The estate hasn't said which way--if any--Ramirez materially participated in 2008 and 2009, but here are the ones that we think might be supported by the record:

- "[t]he individual participates in the activity more than 500 hours during such year;"

- "[t]he individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;"

**[*16]** ●    "[t]he individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;" or

●    "[b]ased on all of the facts and circumstances * * * , the individual participates in the activity on a regular, continuous, and substantial basis during such year."

Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).[8]

The last test seems more flexible than the others, but a taxpayer who reaches for it still has to have spent over 100 hours on the activity. See id. para. (b)(2)(iii), 53 Fed. Reg. 5726. So the amount of time that Ramirez and others spent on her real property trade or business is what matters here.

How do we measure this time? The regulations say that "[t]he extent of an individual's participation in an activity may be established by any reasonable means," and that contemporaneous daily time reports or logs are not necessarily

---

[8] There are three other tests, see sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), but they're not relevant here. Two of them have to do with a taxpayer's history of materially participating in an activity, see id. subpara. (5) and (6), 53 Fed. Reg. 5726, and there's no evidence in the record about any such history. The other has to do with hours spent on "significant participation activities", see id. subpara. (4), and that's a test that we think Ramirez could satisfy only if we've found that she already satisfied one of the others. That means that test can't apply here. See id. para. (c)(1)(ii).

[*17] required.  Id. para. (f)(4), 53 Fed. Reg. 5727.  We've held time and time again, however, that a retrospective "ballpark guesstimate" isn't good enough, and we don't have to accept unverified, undocumented testimony about how a taxpayer spent her time.  See, e.g., Moss v. Commissioner, 135 T.C. 365, 369 (2010); Robison v. Commissioner, T.C. Memo. 2018-88, at *26 (citing Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185, Shaw v. Commissioner, T.C. Memo. 2002-35, and Scheiner v. Commissioner, T.C. Memo. 1996-554); Coastal Heart Med. Grp., Inc. v. Commissioner, T.C. Memo. 2015-84, at *29.

That's a problem here for the estate.  It offered no documentary evidence to prove the amount of time Ramirez spent on her rental activities.  All we have instead is the uncorroborated testimony of Ramirez's daughter and her "guesstimates" of that time.  We found much of her testimony incredible--we don't think she spent as much time with Ramirez as she says she did, and we do think Ramirez's own failing health would've made it difficult for her to devote the hours to her rental activities that her daughter claims.  These evidentiary failures are only made worse by the fact that Ramirez had two other jobs in 2008 and 2009--at Golden Haven and Sunrise Food Mart--that had nothing to do with real estate, and that what evidence we do have suggests that she had quite a bit of help with her rental activities.

**[*18]** We've already found that the estate failed to prove the number of hours that Ramirez devoted to her real-property trade or business in 2008 and 2009, see supra pp. 9-11; we therefore find that Ramirez didn't meet any of the material-participation tests that rely on 100 or 500 hour minimums, see sec. 1.469-5T(a)(1), (3), (7), Temporary Income Tax Regs., supra. We also can't find that Ramirez's participation in her real-property trade or business "constitute[d] substantially all of the participation in such activity of all individuals" in 2008 or 2009, see id. subpara. (2), 53 Fed. Reg. 5725-5726; Ramirez claimed management-fee deductions or signed a management agreement for all her residential properties, and she regularly used two different contractors on her commercial and residential properties. We therefore hold that Ramirez didn't satisfy that test for material participation either.

Because Ramirez didn't meet any of the material-participation tests for her real-property trade or business in 2008 or 2009, she was not a real-estate

[*19] professional in either of those years[9] and her rental activities were passive. See sec. 469(c)(2), (7).

B.    Failure To Aggregate

There's another problem with the estate's case, though.  Even if we found that Ramirez was a real-estate professional in 2008 and 2009, she didn't elect under section 469(c)(7)(A) to treat all her rental properties as a single activity on her original return for 2008 or 2009 or any previous year.  When a taxpayer who owns more than one rental property doesn't make this "aggregation election," the default rule is to treat each rental property as a separate activity.  Sec. 469(c)(7)(A)(ii); see also sec. 1.469-9(e), Income Tax Regs.

How does one make the aggregation election?  The regulations tell a real-estate professional to file a declaration with the first tax return on which she wishes to claim the benefit of aggregating her properties.  This declaration must state that she "is a * * * [real estate professional] for the taxable year and is making the election pursuant to section 469(c)(7)(A)."  Sec. 1.469-9(g)(3), Income

---

[9] Note that the real-estate-professional test looks only at real-property trades or businesses in which a taxpayer materially participates.  See sec. 469(c)(7)(B). We hold that Ramirez didn't materially participate in her real-property trade or business, so we don't need to ask whether more than half of her personal services were performed in that trade or business or whether she spent more than 750 hours on it.  See sec. 469(c)(7)(B).

[*20] Tax Regs. The "election is binding for the taxable year in which it is made and for all future years in which the taxpayer is a * * * [real estate professional], even if there are intervening years in which the taxpayer is not a * * * [real estate professional]." Id. subpara. (1). The estate stipulated that Ramirez never made the aggregation election with her 2008 or 2009 return (or any earlier return).

This election is a formal requirement, and we don't allow taxpayers to aggregate their activity spread among multiple rental properties unless it is met. See Trask v. Commissioner, T.C. Memo. 2010-78, 2010 WL 1507314, at *4-*5 (no aggregation where taxpayer treated all rental properties as single activity on original returns but stated intent to elect only during audit); Kosonen v. Commissioner, T.C. Memo. 2000-107, 2000 WL 311067, at *4-*6 (reporting losses as active and aggregation on return not sufficient statement of intent). Ramirez hits the wall even harder than these taxpayers. She not only failed to make the formal election on her original return, but also failed to treat her rental properties as a single activity and even reported all of them as passive activities. There's only one escape hatch for someone stuck in this situation--a late aggregation election.

There are two ways to do this. One is to ask the IRS for a letter ruling under section 301.9100-3, Proced. & Admin. Regs.--a request the Commissioner

[*21] should've granted so long as Ramirez proved she acted reasonably and in good faith, and that the relief wouldn't prejudice the government's interests. See generally Vines v. Commissioner, 126 T.C. 279 (2006). Ramirez would've had to check many boxes to request a letter ruling, not the least of which is the requirement to follow the "applicable procedures for requests for a letter ruling" and pay the "applicable user fee." See sec. 301.9100-3(e)(5), Proced. & Admin. Regs.; see also, e.g., Rev. Proc. 2012-1, 2012-1 I.R.B. 1. Ramirez didn't do any of that here.

The other way Ramirez might've made a late aggregation election is under Revenue Procedure 2011-34, 2011-24 I.R.B. 875. That procedure lets some taxpayers make late elections; its "procedures * * * are in lieu of the letter ruling procedure." Id. secs. 1, 3.02, 2011-24 I.R.B. at 875. It requires a taxpayer to file an amended return and attach to it an aggregation-election statement that includes four specific representations necessary to qualify for relief. See id. sec. 4.02, 2011-24 I.R.B. at 875-76. Ramirez had to be able to show that:

- she "failed to make an election under § 1.469-9(g) solely because * * * [she] failed to timely meet the requirements in § 1.469-9(g);"

[*22]   ●   she "filed consistently with having made an election under § 1.469-9(g) on any return that would have been affected if * * * [she] had timely made the election;"[10]

   ●   she "timely filed each return that would have been affected by the election if it had been timely made;" and

   ●   she "has reasonable cause for [her] failure to meet the requirements in § 1.469-9(g)."

Id. sec. 4.01, 2011-24 I.R.B. at 875.

The estate concedes that Ramirez and it haven't filed an amended return for either 2008 or 2009,[11] and that it has not filed with the Commissioner any statement like the one described in the revenue procedure.  But it argues, rather opaquely, that we can still follow Rev. Proc. 2011-34, supra, "as a reasonable means to retroactively aggregate [Ramirez's] rental real estate activities as a single activity for purposes of the passive loss limitation rules and for material

---

[10] This one also says:

[She] must have filed all required federal income tax returns consistent with the requested aggregation for all of the years including and following the year * * * [she] intends the requested aggregation to be effective and no tax returns containing positions inconsistent with the requested aggregation may have been filed by or with respect to * * * [her] during any of the taxable years.

Rev. Proc. 2011-34, sec. 4.01(2), 2011-24 I.R.B. at 875.

[11] The estate doesn't argue that Ramirez or it filed an amended return for any other year either.

**[\*23]** participation."[12]  We have serious doubts about our ability to do that, <u>see</u>

<u>Estate of Shapiro v. Commissioner</u>, 111 F.3d 1010, 1018 (2d Cir. 1997) (revenue

procedures ordinarily not binding and don't confer rights upon taxpayers), <u>aff'g</u>

T.C. Memo. 1993-483; <u>see also</u> <u>Capitol Fed. Sav. & Loan Ass'n</u>, 96 T.C. at 217,

but it doesn't matter because Ramirez wouldn't have qualified for relief under

Revenue Procedure 2011-34, <u>supra</u>.

*Only a Timing Problem*.  While it's true that Ramirez failed to *timely* make

the aggregation election with her 2008 and 2009 original returns, we can't even

say that timing is the *only* reason for her failure.  The estate admits that Ramirez

and it didn't learn about the aggregation election until the audit--long after either

return was due--and the estate still hadn't filed an amended return and election

statement at the time it turned in its posttrial briefs.  Ramirez also reported all her

rental activities as passive for 2008 and 2009--offsetting large dollops of passive

---

[12] The estate also argues that Ramirez told the IRS at her audit that she intended to make a late aggregation election under Revenue Procedure 2011-34, <u>supra</u>, but it admits no one filed amended returns or election statements.  We will sometimes review for abuse of discretion the Commissioner's compliance with a revenue procedure.  <u>See, e.g.</u>, <u>Capitol Fed. Sav. & Loan Ass'n v. Commissioner</u>, 96 T.C. 204, 217-19 (1991).  The problem here is that Ramirez and then her estate never took any of the steps required by the revenue procedure to make a late election.  The Commissioner can't abuse discretion he hasn't been asked to exercise. <u>See, e.g.</u>, <u>McCoy Enters., Inc. v. Commissioner</u>, 58 F.3d 557, 563 (10th Cir. 1995), <u>aff'g</u> T.C. Memo. 1992-693.

[*24] income--which leads us to conclude that she didn't want to aggregate her rental properties and didn't know about the aggregation election when she filed her original 2008 and 2009 returns. Either way, her failure to make the election was not only about timing.

*Election Consistent with Filed Returns*. The second requirement is that Ramirez filed her 2008 and 2009 returns (and any subsequent returns) consistent with an aggregation election. See Rev. Proc. 2011-34, sec. 4.01(2), 2011-24 I.R.B. at 875. As we've said, Ramirez reported all her rental activities as passive for 2008 and 2009, and the estate didn't offer any evidence about her reporting positions in subsequent years. If she'd made the aggregation election, the estate argues that her rental activities would've been active because, when aggregated, Ramirez materially participated in her rental activities. Those reporting positions are entirely inconsistent. Ramirez thus did not file her returns consistent with having made the aggregation election.

*Reasonable Cause*. Ramirez also failed to show she had reasonable cause for failing to make the election in the first place. See id. sec. 4.01(4). The estate points out that Ramirez used a CPA to prepare her 2008 and 2009 returns--and that she "supplied her paid preparer with all the necessary information to complete her income tax return and her preparer knew or should have known that the

**[*25]** election was available to" her. Reasonable reliance on an adviser--such as a CPA--can be reasonable cause. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Caselaw points to three factors to determine whether reliance was reasonable:

- the adviser was a competent professional with sufficient expertise to justify reliance;

- the taxpayer provided necessary and accurate information to the adviser; and

- the taxpayer actually relied on the adviser's judgment in good faith.

Id. at 99.

Our analysis here is brief. There's no evidence in the record about the competence of the CPA who prepared Ramirez's 2008 and 2009 returns, except for the fact that he appears to have been a CPA--at least Ramirez's returns say he was a CPA. See id. We also don't see anything in the record about the quantity or quality of information that Ramirez gave him, and there's no proof that he gave Ramirez any advice on which she relied. See id.; see also Woodsum v. Commissioner, 136 T.C. 585, 592-93 (2011). Indeed, the estate is now taking a position contrary to the one taken on Ramirez's returns--that her rental activities were active instead of passive--so it can't argue that Ramirez relied on her CPA to advise her about an election that was irrelevant to the position she took. Ramirez

[*26] doesn't have reasonable cause for failing to meet the requirements of the aggregation election.

This all means that the estate doesn't satisfy the conditions for a late election under the revenue procedure, which means we wouldn't grant it that relief even if we thought we could. And without aggregation, the estate can't satisfy the material-participation requirement for any of its properties. Ramirez's daughter testified only to her mom's spending 19-25 hours per month on the residential properties and she didn't even try to allocate those hours among the individual properties. So, even if Ramirez were a real-estate professional in 2008 and 2009, and even if she had sufficient evidence to establish the hours that she spent on her rental activities, we would have to find that Ramirez's rental activities were passive in 2008 and 2009.

Her original returns were right on that point.

II.    Sections 6662(a) and 7491(c)

   A.    Section 6662(a) Penalties

The Commissioner also argues that the estate owes penalties for 2008 and 2009 because Ramirez's returns substantially understated the tax due. The Code tells us that an understatement is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(a), (b)(2),

**[*27]** (d)(1)(A). The Commissioner has no trouble meeting this because Ramirez's understatements for 2008 and 2009 are much more than $5,000 and 10% of the required tax. See sec. 6662(d)(1)(A).

The estate says it shouldn't be held liable for the penalties, however, because Ramirez had reasonable cause and acted in good faith. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs. As with its reasonable-cause argument under Revenue Procedure 2011-34, supra, the estate once again argues that Ramirez relied on her CPA to prepare her returns and advise her about the aggregation election. For the same reasons we held that Ramirez didn't have reasonable cause under the revenue procedure, see supra pp. 24-25, we hold that she doesn't have a reasonable-cause defense to the penalties.

Lurking beneath this altogether common dispute about penalties, however, is a *Chai* ghoul that we had not seen before. See Chai v. Commissioner, 851 F.3d 190 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42.

B.      Section 7491(c) Burden of Production

Section 6751 tells us that the Commissioner cannot assess a section 6662 penalty unless it is "personally approved (in writing) by the immediate supervisor of the individual making such determination." We now know this provision means that the Commissioner cannot assert a penalty in a notice of deficiency or

[*28] an amended answer without that approval.  See Graev v. Commissioner (Graev III), 149 T.C. __, __ (slip op. at 14) (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016).  We also know from Wheeler v. Commissioner, 127 T.C. 200, 210-12 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008), that if there is no evidence in the record of an essential condition for the imposition of a penalty, the party who had the burden of production loses.  See also Ford v. Commissioner, T.C. Memo. 2018-8, at *6 (true as well when there is no evidence of compliance with section 6751), aff'd, __ F. App'x __, 2018 WL 5794470 (6th Cir. Nov. 5, 2018).

This question would be easy if Ramirez had lived--it would be just like Ford or several other cases we've had since Graev III, and we would hold that the Commissioner's failure to introduce any evidence that showed he had complied with section 6751 means that he loses on the penalty issue.  What makes this case novel is that Ramirez died and her estate stepped into her shoes.  What does section 7491(c) say about the burden of production when an estate is the petitioner?

The *text* of that section is superficially clear:  It says that the Commissioner has the burden of production on penalties only "in any court proceeding with respect to the liability of any *individual*."  Sec. 7491(c) (emphasis added).  We

**[*29]** have nevertheless suggested that section 7491(c) transfers the burden of production to the Commissioner in cases where an estate's liability for tax is at issue:

- Estate of Sanders v. Commissioner, T.C. Memo. 2018-104, at *60 (applying 7491(c) to an individual decedent's estate and substituting "taxpayer" for "individual");

- Estate of Lin v. Commissioner, T.C. Memo. 2017-77, at *6 (applying 7491(c) in a decedent's redetermination proceeding without explanation and substituting "taxpayer" for "individual");

- Estate of Beyer v. Commissioner, T.C. Memo. 2016-183, at *149 (paraphrasing 7491(c) to place the burden of production with respect to 6651 and 6662 penalties on the Commissioner);

- Estate of Dieringer v. Commissioner, 146 T.C. 117, 134 (2016) (substituting "taxpayer" for "individual" in applying section 7491(c));

- Estate of Richmond v. Commissioner, T.C. Memo. 2014-26, at *47 (paraphrasing 7491(c) to place the burden of production with respect to a 6662 penalty on the Commissioner);

- Estate of Giovacchini v. Commissioner, T.C. Memo. 2013-27, at *106 (substituting "estate" for "individual" in applying section 7491(c)).

There are undoubtedly others.

In all these cases, however, the paraphrase made no difference--the Commissioner met his burden of production if he had to meet it. See, e.g., Estate

**[*30]** of Sanders, at *60 ("Decedent did not file a Form 1040 with the IRS for tax year 2002.  Therefore, respondent has met his burden of production"); Estate of Lin, at *6-*7 ("Respondent has discharged his burden of production by providing sufficient evidence showing that petitioner's understatement of income tax for 2012 exceeds the greater of 10% of the tax that was required to be shown on the 2012 return or $5,000").

Here the distinction will make a difference, and we have before us not a deficiency in estate tax, but of income tax; some original analysis is due.

We first looked at section 7491(c) in Higbee v. Commissioner, 116 T.C. 438 (2001), after Congress enacted the IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685.  Higbee dealt with the redetermination of two married individuals' tax deficiencies, which included failure-to-file and accuracy-related penalties.  Higbee, 116 T.C. at 438.  While Higbee uses the word "individual" when paraphrasing section 7491(c), it goes on to cite a chunk of legislative history that explains the Commissioner's burden of production with respect to a penalty against a "taxpayer".  Id. at 446.  From there, Higbee transitions into a discussion of the difference between "burden of production" and "burden of proof" and cites section 7491(a)--which uses the word "taxpayer" and not "individual"--before explaining that "once the Commissioner meets his burden

**[*31]** of production, the *taxpayer* must come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." Id. at 446-47 (emphasis added). This discussion may have introduced a bit of confusion by implying "individual" and "taxpayer" are synonymous in section 7491, and because nearly every later case that applies section 7491(c) cites Higbee at least in passing.

We have nevertheless read the text of section 7491(c) more closely in cases where it matters. In NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006), we held that a corporation is not an individual under section 7491(c). And in Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. __, __ (slip op. at 16-17) (May 7, 2018), we analyzed the text of section 7491(c) with greater care to determine if it shifts the burden of production to the Commissioner when the petitioner is a TEFRA partnership. This analysis first homed in on the "nature of the proceeding" before us, and we found that while "[p]artners are treated as the parties to a partnership-level proceeding, * * * the proceeding itself is conducted at the partnership level. It is the partnership return that is examined; it is partnership items that are adjusted; and it is partnership items and the applicability of penalties that are determined in a partnership-level proceeding." Id. at __ (slip op. at 18). Because section 7491(c) focuses on the nature of the proceeding, we

[*32] held that a partnership-level proceeding under TEFRA was not a "proceeding with respect to the liability of any individual" and thus that the Commissioner did not bear the burden of production on penalties.

In our analysis we found especially telling that Congress used the word "taxpayer" in section 7491(a), but "individual" in section 7491(c)." Id. at __ (slip op. at 19). But what do we do when the "petitioner" who starts a case as an individual becomes an estate before trial?

There is no question that an individual decedent and his estate are legally distinct for federal tax purposes. The Code distinguishes them. See secs. 1(e) (setting separate income tax rates for estates and individuals), 68(e) ("This section [pertaining to individual taxpayers] shall not apply to any estate or trust"), 641(b) ("The taxable income of an estate or trust shall be computed in the same manner as in the case of an individual"), 7701(a)(1) ("individual" and "estate" two different species of genus "person"). The regulations distinguish them. See sec. 1.641(b)-2(b), Income Tax Regs. (contrasting "estate" of infant, incompetent, or individual in receivership with estate of deceased person or of a trust). And our caselaw distinguishes them. See, e.g., Prashker v. Commissioner, 59 T.C. 172, 177 (1972) (decedent and estate are separate legal entities); Frank v. Commissioner, 6 B.T.A. 1071, 1072 (1927) (same).

**[\*33]** That general principle doesn't quite answer the specific question here, though, because section 7491(c) puts the burden of production on the Commissioner only "in any court proceeding with respect to the liability of any individual." We need to focus, as we did in <u>Dynamo Holdings</u>, on the nature of the proceeding. Is this case a proceeding with respect to the liability of Ramirez as an individual or of her estate? We think the answer is that it is a proceeding to determine the liability of an individual. Even though Ramirez's additional tax[13] liability had not been assessed at the time of her death, it was established and constituted a debt due the United States while she was still alive. <u>United States v. Moore</u>, 423 U.S. 77 (1975) (obligations to United States fixed even when exact amount not determined); <u>O'Sullivan v. Commissioner</u>, T.C. Memo. 1994-17, 1993 WL 548585, at \*3 (tax ascertainable when tax period ends and IRS considered creditor as of close of applicable year). This means that even before her death, Ramirez was liable as an individual for her 2008 and 2009 income-tax debts.[14]

---

[13] A penalty is treated and assessed as a tax under the Code. Sec. 6665(a).

[14] Had Ramirez died before the end of 2009, our analysis might be more complicated, because an individual's tax liability generally is fixed at the end of a calendar year. And, while a decedent's final return is subject to basically the same rules as an individual's, <u>see</u> sec. 6012(b)(1) (return of decedent to be filed by executor in same manner as living individual), it's not obvious that this liability is one of the individual decedent or her estate. We'll wait for a case where it makes

(continued...)

**[\*34]** Section 7491(c) says the Secretary has the burden of production in "any court proceeding with respect to the liability of any individual" for penalties or additions to tax. "Court proceeding" is defined in section 7430(c)(6) as "any civil action brought in a court of the United States (including the Tax Court)." Ramirez petitioned our Court to redetermine liabilities that became fixed at the end of calendar years 2008 and 2009; her estate continued it, but the proceeding remained one to redetermine those liabilities. We think the best reading of section 7491(c) here is that the Commissioner has the burden of production on penalties: This case was begun by, and concerns the tax liability of only Ramirez in her individual capacity. It is Ramirez's original returns that we examine; it is Ramirez's individual items of income and loss that we adjust; and it is the penalties the Commissioner asserts against Ramirez that we redetermine.

That different focus in this case distinguishes it from the estate-tax cases where we may have just assumed that section 7491(c) shifted the burden of production to the Commissioner. Here we redetermine Ramirez's individual tax liabilities, and the scope of this proceeding was set when she filed a timely petition in response to the notice of deficiency. See sec. 6213(a); Guarino v.

---

[14](...continued)
a difference to decide.

[*35] <u>Commissioner</u>, 67 T.C. 329, 331 (1976); <u>see also</u> <u>NT, Inc.</u>, 126 T.C. at 195. So while the Commissioner will presumably make a claim against and collect from Ramirez's estate when this case is done, in this proceeding we determine her liabilities as an individual.

This means that the Commissioner had the burden of production on the issue of Ramirez's liabilities for the penalties he determined. He failed to carry that burden by failing to show that he complied with section 6751. We therefore find that her estate does not owe it.

This is a split result, so

<u>Decision will be entered under</u>

<u>Rule 155</u>.
